# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALTICOR INC., a Michigan corporation, and AMWAY CORP., a Virginia corporation,<br><br>        Plaintiffs,<br><br>v.<br><br>WEIQUAN WENG, a natural person, ZMALLSTORE LLC, a New York limited liability company, and JOHN DOES 1-10, individually or as corporate/business entities,<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 USC § 1114; 15 USC § 1125(a); 15 USC § 1125(c); TORTIOUS INTERFERENCE; AND RELATED CLAIMS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Alticor Inc. and Amway Corp. (collectively, "Plaintiffs") bring this action against defendants Weiquan Weng, Zmallstore LLC, and John Does 1-10 (collectively, "Defendants") for (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (4) common law trademark infringement and unfair competition; (5) unfair and deceptive business practices in violation of NY Gen. Bus. L. § 349; and (6) tortious interference with existing and/or prospective contracts and business relationships. These claims arise from Defendants' misappropriation of Plaintiffs' trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Plaintiffs' trademarks to unwitting customers. In support of their complaint, Plaintiffs allege as follows:

## PARTIES

1.      Alticor Inc. ("Alticor") is a corporation, organized under the laws of the State of Michigan, with its principal place of business located in Ada, Michigan. Alticor is the parent

1

company of Amway Corp. and the owner of the Amway family of trademarks and all associated intellectual property rights.

2.      Amway Corp. ("Amway") is a corporation, organized under the laws of the State of Virginia, with its principal place of business located in Ada, Michigan.

3.      Weiquan Weng ("Weng") is a natural person who, upon information and belief, resides at 918 127th Street, Flushing, NY 11356.  Upon information and belief, Weng operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "Z-MAll."  The storefront has had other names in the past, including "Gkkidi," and can be accessed at https://www.amazon.com/sp?seller=A2LQOSOL8B8JEQ.  Through the "Z-MAll" storefront, Weng does business throughout the United States.

4.      Zmallstore LLC is a limited liability company, organized under the laws of the State of New York.  Upon information and belief, the principal place of business of Zmallstore LLC is located in Flushing, New York.

5.      Upon information and belief, Zmallstore LLC was formed on June 24, 2020, when articles of organization of Zmallstore LLC were filed with the New York Department of State. The articles designate the New York Secretary of State as the agent of Zmallstore LLC upon whom process against it may be served and list 4002 Bowne Street, #178, Flushing, NY 11354 as the address where the Secretary of State shall mail a copy of process served on it as agent of Zmallstore LLC.

6.      4002 Bowne Street, Flushing, NY 11354 is the address of a business called Secure Shipping that, among other services, rents private mailboxes to customers.  Zmallstore LLC's articles of organization do not list any other address for it apart from mailbox #178 at Secure Shipping.

7. Upon information and belief, Zmallstore LLC operates or assists in the operation of the "Z-MAll" storefront on Amazon. Through the "Z-MAll" storefront, Zmallstore LLC does business throughout the United States.

8. Upon information and belief, Weng is a member of, in control of, and primarily responsible for Zmallstore LLC and its actions. As is detailed below, Secure Shipping disclosed, in response to a subpoena, that Weng is the owner of mailbox 178 at Secure Shipping.

9. Plaintiffs assert claims against Weng in both his individual capacity as well as his capacity as a member of Zmallstore LLC.

10. Upon information and belief, both Weng in his individual capacity and Zmallstore LLC assist in the operation of the "Z-Mall" Amazon storefront.

11. Alternatively, upon information and belief, Weng directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Plaintiffs' trademarks by Zmallstore LLC. Accordingly, Weng is personally liable for infringing activities of Zmallstore LLC without regard to piercing the corporate veil.

12. Alternatively, upon information and belief, Zmallstore LLC follows so few corporate formalities and is so dominated by Weng that it is merely an alter ego of Weng. This is reflected, in part, by the fact that Zmallstore LLC filed articles of organization with the New York Department of State that provide no information about Zmallstore LLC except for the number of a private mailbox, owned by Weng, at Secure Shipping. Accordingly, Plaintiffs are entitled to pierce the corporate veil of Zmallstore LLC and hold Weng personally liable for the infringing activities of Zmallstore LLC.

13. Plaintiffs believe that other individuals or entities may be responsible for the events and occurrences referred to herein or are otherwise interested in the outcome of the dispute. The

true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Plaintiffs. Therefore, Plaintiffs sue these Defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these parties are ascertained, Plaintiffs will seek leave to amend this Complaint accordingly.

## JURISDICTION

14.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. Plaintiffs' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and their claims arising under the laws of the State of New York are substantially related to their federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

15.     This Court has personal jurisdiction over Defendants because they reside in the State of New York and transact business within New York. Upon information and belief, Defendants store their inventory within New York and ship infringing products from New York when consumers purchase products from Defendants over the Internet.

## VENUE

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district and because Defendants reside in this district.

## FACTUAL ALLEGATIONS

### Plaintiffs and Their Trademarks

17.     Plaintiffs are worldwide leaders in developing, manufacturing, and providing nutrition, beauty, bath and body, cookware, household, and other products to consumers under various brands, including Amway®, Nutrilite®, and Artistry® (collectively, "Amway products"). Plaintiffs permit Amway products to be sold to U.S. consumers only through Amway.com and through Amway Independent Business Owners ("IBOs"), which enter into contracts with Amway to be able to sell Amway products.

18.     Plaintiffs devote a significant amount of time, energy, and resources toward protecting the value of their brands, products, name, and reputation.  By distributing products exclusively through their own website and through IBOs, Plaintiffs ensure the safety, well-being, and satisfaction of consumers and maintain the integrity and reputation of the Amway family of brands.  IBOs provide users of Amway products with explanation and guidance about the safe and proper use of Amway products.  IBOs are required by their contracts with Amway to exercise strict quality control requirements over the products they sell to consumers.  In the highly competitive nutrition and household product market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

19.     To promote and protect the Amway family of brands, Alticor has registered numerous trademarks with the United States Patent and Trademark Office.  These trademarks include, but are not limited to: AMWAY® (U.S. Trademark Registration Nos. 716,672, 847,709, 4,031,832, 4,199,852, 4,289,794, and 4,481,517), NUTRILITE® (U.S. Trademark Registration Nos. 402,891, 689,389, 2,145,912, 3,535,340, 4,748,189, and 4,478,190), and ARTISTRY® (U.S.

Trademark Registration Nos. 856,184, 1,505,505, 1,519,877, and 4,645,525), (collectively, the "Amway Registered Trademarks").

20.     Alticor has licensed the Amway Registered Trademarks to various subsidiaries, including Amway.

21.     The registration for each of the Amway Registered Trademarks is valid, subsisting, and in full force and effect.

22.     Plaintiffs actively use and market all of the Amway Registered Trademarks in commerce.

23.     Due to the quality and exclusive distribution of Amway products, and because Plaintiffs are recognized as the sources of high quality products, the Amway Registered Trademarks have substantial value.

### Online Marketplaces and the Threat They Pose to Plaintiffs' Quality Controls, Reputation, and Goodwill

24.     E-commerce retail sales have exploded over the past decade.  From 2009 to the end of 2019, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 11.4%. *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (February 19, 2020), https://fred.stlouisfed.org/series/ECOMPCTSA.

25.     In 2019, consumers spent $601.75 billion on e-commerce sales, a 14.9% increase from 2018.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2019, United States consumers spent $221.95 billion in e-commerce sales on Amazon, a 25.3% increase from 2018.  *See* Jessica Young, *U.S. ecommerce sales grow 14.9% in 2019*, DIGITAL COMMERCE 360 (February 19, 2020), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

26. Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

27. Unlike when purchasing products at brick-and-mortar stores or in interpersonal transactions, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them. Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

28. Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller. As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

29. Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers. It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels. *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market*," CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE

WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.

30.     It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.    *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

31.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine. *See* Spencer Soper, *Amazon Gets Real About Fakes*, BLOOMBERG, Nov. 28, 2016, https://www.bloomberg.com/ news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

32.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.   The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.   The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers,

and that under current law it is up to rights holders to protect their intellectual property rights online. *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

33.     In its 2018 and 2019 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available at* https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a.

34.     Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

35.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic. A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, some of a brand owner's products are ingested by consumers.

36.     The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

37.     When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the manufacturer. Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "By [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

38.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

39.     When a consumer purchases on an online marketplace and receives a product that is damaged, defective, expired, soon-to-expire, counterfeit, or of otherwise poor quality, the consumer is much more likely to associate that frustration with the brand/manufacturer than the product seller.

40.     Online marketplaces also give disgruntled consumers a powerful and convenient forum to air their grievances about problem products: online product reviews. Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see. These reviews, which are often permanently fixed, will generally criticize the brand rather than the marketplace seller who sold the product.

41.     Online product reviews significantly impact a brand's reputation. Survey results show that 82% of United States adults "sometimes" consult online reviews for information when

they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

42.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, one survey found that consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by brand owners.  Moms Place Trust in Other Consumers, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.      Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

43.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a brand owner's reputation and goodwill.

**Plaintiffs' Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written By Customers Who Purchased Poor Quality Products from Unauthorized Sellers On Online Marketplaces**

44.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

45.     Numerous consumers have written negative reviews of Amway products being offered for unauthorized sale on online marketplaces.  In these reviews, examples of which are set

forth below, consumers have given misappropriated Amway products low "ratings" and complained of receiving products that were expired, damaged, tampered with, counterfeit, or otherwise different from what was advertised.

46. For example, on August 15, 2020, a customer complained that an Amway product she purchased on Amazon was "fake" and "doesn't look the same" as previous Amway products she had purchased.



47. On June 14, 2020, Amazon user "Kathleen Ann Gillis" complained that an Amway product she purchased on Amazon was defective and "previously opened and taped closed" when she received it.



48. On May 15, 2020, Amazon user "Laura" complained that, after she purchased what purported to be an Amway product, she received an "opened bottle and weird pills" that she knew were not the "actual content" of Amway products she had purchased in the past.



Laura

⭐☆☆☆☆ **Extremely disappointed!!!!!!**
Reviewed in the United States on May 15, 2020
Verified Purchase

I had purchased this product several times, i got my order yesterday this is what i received. An opened bottle and weird pills, i know this is not the actual content
Very disappointed,



3 people found this helpful

49.     On April 12, 2020, Amazon user "Kathy kobe" complained that an Amway product she purchased on Amazon was "burst open" when she received it and could not be returned for a refund.



Kathy kobe

⭐☆☆☆☆ **defective**
Reviewed in the United States on April 12, 2020
Verified Purchase

product was burst open and I can't return it???????

50.     On March 23, 2020, Amazon user "Naveen K." reported that, after she purchased 6 units of an Amway product on Amazon, she received only 4 units of the product.



Naveen K.

⭐☆☆☆☆ **Partial Package**
Reviewed in the United States on March 23, 2020
Size: 6-Pack    Verified Purchase

I bought a pack of 6 but THERE WERE JUST 4 IN THE PACKAGE!!! Where's the rest my guy? 😂😂😭

51.     On February 22, 2020, Amazon user "Maria Molina" complained that an Amway product she purchased on Amazon arrived with a "bag inside" that was "ripped."



52.     On December 12, 2019, Amazon user "Paula" reported that, after she purchased an

Amway product on Amazon, she received a product sold under an entirely different brand.



53.     On October 27, 2019, Amazon user "Lizandro Diaz" complained that an Amway

product she purchased on Amazon did not arrive in its original box and tasted different from past

units of the same product she had been using for years.



54.     On October 3, 2019, Amazon user "Birdy" reported that an Amway product she

purchased on Amazon was expired and her only option for returning the product was to ship it to

India "for big amount of your money."



Birdy

⭐☆☆☆☆ **buyer beware**
Reviewed in the United States on October 3, 2019
**Verified Purchase**

buyer beware!! expired product and if you want to return it. Seller tell you to send to INDIA for big amount of your money shipping it back. Totally rip off!!!!

2 people found this helpful

Helpful | ⌄ Comment | Report abuse

55.     On August 7, 2019, an Amazon customer complained that an Amway product she purchased on Amazon had solely Chinese language on its packaging and had expired more than 15 years before her purchase.



Amazon Customer

⭐☆☆☆☆ **Disappointed!!! Bad experience with this product!**
Reviewed in the United States on August 7, 2019
**Verified Purchase**

First of all: dissatisfied and disappointed.
Don't buy this product. I fell that something is not right. I ve been using this brand for a while now and i can see the difference. Plus if you look in the pictures ,everything its in Chinese..no offense but it should say something in english, right? Since they ship it to USA.
Second:what is the expiration date?? December-2003??? Help me out here because i m loosing it.
I got the toothpaste in my mail and i was shocked to see the product.it is a joke or what?
Of couse its non returnable and i m stuck with a product that i m afraid to use it.
I would give 0 stars but i don't have this option.
Super disappointed.

56.     On July 29, 2019, Amazon user "hwat" complained that an Amway product he purchased on Amazon was "like lard in a bottle" and caused his washing machine to malfunction.



hwat

⭐☆☆☆☆ **Greasy**
Reviewed in the United States on July 29, 2019
**Verified Purchase**

I always thought Amway products was top-of-the-line. This product was like lard in a bottle would not thin out and have a greasy face to it stopped up my washing machine and had to have products put into it to decrease the tank and system

2 people found this helpful

57.     On February 16, 2019, Amazon user "Anish Clements" reported that an Amway product he purchased on Amazon "was already opened" and had an "aluminum foil cover [that] was torn off already."  He explained that "[w]e bought it thinking it's Amway but I think it's a scam."



58.     On December 5, 2018, Amazon user "Immortal" complained that an Amway product he purchased on Amazon had expired 18 months ago.



59.     On October 13, 2018, Amazon user "Frank Schine" reported that "something is not right" because an Amway product he purchased on Amazon was different from Amway products he had used in the past, even though "the packaging looks the same."



60.    On September 30, 2018, a customer reported that an Amway bottle product he purchased on Amazon arrived without a cap.



61.    On September 9, 2018, Amazon user "Jordan Tapia" complained that an Amway product he purchased on Amway was "previously opened when I received it" and had its serial number scratched off.



62.    On July 5, 2018, Amazon user "Chauma" reported that an Amway product she purchased on Amazon "[c]ame with no box" and in a "poor quality bottle."  She urged other customers: "Don't waste your money."



63.     On June 17, 2018, Amazon user "Keedy" complained that Amway products he

purchased on Amazon had "grease in the inside and all items were covered in it."



64.     On June 12, 2018, Amazon user "Rey" complained that an Amway bottle product

she purchased on Amazon "came pre-opened," which she showed in a photograph she took.



65.    On May 5, 2018, an Amazon customer complained that Amway vitamin products he purchased on Amazon "were not vacuumed sealed and had holes in them." He added that "[i]t looks like the holes were made in an attempt to scratch off manufacture information and or expiration data information.  See Attached Photos."



66.    On April 11, 2018, Amazon user "Ash" complained that the "size and smell" of an Amway product she purchased on Amazon "are totally different from what I bought directly from Amway."



67.    On April 5, 2018, an Amazon customer complained that an Amway product he purchased on Amazon looked "VERY suspicious" because the "[o]riginal Nutrilite seal on the box was broken, [and] some information on the label on plastic container has been scratched off. Perhaps, replacing items inside with older ones ??"



68.     On January 9, 2018, Amazon user "Faith" complained that she "didn't even want to touch the pills themselves" because an Amway product she purchased on Amazon "smells absolutely awful."



69.     On December 26, 2017, Amazon user "SN" complained that, after he purchased an Amway product on Amazon, he received a product that was expired, intended for sale in a foreign country, and different in many respects from Amway products he had previously used that were intended for sale in the United States.



70.     On September 27, 2017, Amazon user "TJ Birmingham" complained that an Amway product he purchased on Amazon arrived in a box that was "FILLED WITH ANTS."



**TJ Birmingham**

⭐☆☆☆☆  **THERE WERE ANTS IN MY BOX**

Reviewed in the United States on September 27, 2017

**Verified Purchase**

The pills are good but MY BOX WAS FILLED WITH ANTS IM DISGUSTED

71.     The foregoing reviews are only a small sample of negative reviews of products sold without authorization that bear the Amway Registered Trademarks that appear on the Amazon website.

72.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.

73.     Given that Defendants are selling a high volume of products bearing the Amway Registered Trademarks on Amazon and are not subject to Plaintiffs' quality controls, however, upon information and belief, some of the foregoing negative reviews—and the many similar reviews of unauthorized products bearing the Amway Registered Trademarks that appear on the Amazon website—were written by customers who purchased such products bearing the Amway Registered Trademarks from Defendants.

**Plaintiffs Exercise Strict Quality Controls Over the Production and Distribution of Amway Products, Allow Products To Be Sold Only in Certain Channels, and Provide a Guarantee for Products Purchased from IBOs**

74.     To maintain quality controls over Amway products, Plaintiffs allow Amway products to be sold in the United States only by Plaintiffs themselves (through Amway.com) or by IBOs.

75.     Because of the threats to their goodwill and consumer safety that are caused by sales on online marketplaces, as discussed above, Plaintiffs do not sell Amway products on any online marketplace and strictly prohibit IBOs from selling Amway products on any online marketplace.

76.     IBOs are permitted to sell Amway products on the Internet only if they do so through an authorized Amway.com platform.

77.     IBOs must enter into contracts with Amway to be permitted to sell Amway products.  These contracts authorize IBOs to sell Amway products only in certain channels and require IBOs to provide various customer services and exercise various quality controls over Amway products (collectively, the "Amway Rules").  Amway enforces the quality controls established in the Amway Rules and its contracts with IBOs, and its ability to maintain quality controls is essential to the integrity and safety of Amway products, the value of the Amway Registered Trademarks, and the safety and satisfaction of consumers.

78.     The Amway Rules require, among other customer service requirements and protections, that IBOs provide customers with vital information regarding Amway products and their uses.  This person-to-person interaction between IBOs and their customers allows for explanation and guidance on the safe and proper use of Amway products.  To this end, the Amway Rules prohibit IBOs from selling or displaying Amway products in retail establishments.

79.     Under the Amway Rules, IBOs must also provide personal services to customers concurrently with and after their sales.  IBOs have access to literature and other educational materials developed to advise customers on each product's purpose, features, and benefits.  IBOs are therefore uniquely qualified to explain best practices for safe and optimal use of Amway products, and these services of course cannot be provided by non-IBOs who sell Amway products.

80.     IBOs are also trained and instructed to present only complete and truthful information about Amway's products and services, and must refer only to the statements permitted in authorized literature.  It is essential to consumer well-being and Plaintiffs' reputation that customers are able to make fully informed decisions about whether to purchase Amway products and which products to purchase.  The Amway Rules prohibit IBOs from providing misleading or false information to customers, and Amway monitors its IBOs to ensure that IBOs do not violate these prohibitions.

81.     To ensure that customers receive products of the quality they have come to expect from Plaintiffs, IBOs are prohibited from altering any Amway product, label, or accompanying literature.  IBOs may sell Amway products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of Amway products.  IBOs must explain to customers that Amway products are safest when used as directed on the product labels.

82.     IBOs must also follow storage and handling requirements for all Amway products, including storing products in a cool, dry place and ensuring that products are never exposed to freezing temperatures.  Numerous Amway products are permanently damaged if they are allowed to freeze.

83.     Amway tracks all purchases of Amway products from Amway.com and from IBOs, so that it can conduct a recall or disseminate other important consumer safety information in the event that a quality control issue arises.  Amway is not able to track products that are sold outside of authorized channels, however, and is thus unable to alert customers who purchased from unauthorized sellers if a quality issue arises.

84.     For all of these reasons, Plaintiffs limit third party sales of their products to IBOs who have access to, and must follow, the Amway Rules.  By so limiting their sales, Plaintiffs are

able to protect the safety of their consumers and maintain the integrity and reputation of the Amway family of brands.

85.     Amway also prohibits IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell those products on the Internet (including on Amazon).  The purpose of this restriction is to ensure that Amway products are sold to consumers only by Plaintiffs themselves or by IBOs who are subject to and follow Plaintiffs' quality controls.

86.     Amway also provides customers who purchase Amway products through authorized channels of distribution with the Amway Satisfaction Guarantee ("Satisfaction Guarantee"), which allows customers who are not completely satisfied with an Amway product to receive a refund or product replacement within 180 days of purchase.  Customers who purchased Amway products from IBOs are given a full refund, credit, or a product exchange by the IBO from whom they purchased their product.  Customers who purchased products from Amway.com may return their products to Amway, in accordance with return instructions on their product's official packing slip.

87.     Amway offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to Plaintiffs' quality controls and have agreed to follow their quality controls—specifically, IBOs and Plaintiffs themselves.  Because non-IBOs are not subject to Plaintiffs' quality controls and Amway cannot therefore ensure the quality of products sold by non-IBOs, the Satisfaction Guarantee is not available for Amway products purchased from any third party who is not an IBO.

**Amway's Discovery of Defendants' Sales of Amway Products**
**on the Internet and Identification of Defendants**

88.     Because the unauthorized sale of Amway products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the Amway Registered Trademarks, Amway actively monitors the sale of Amway products online.

89.     Through these efforts, in or around May 2020, Amway discovered that high volumes of products bearing the Amway Registered Trademarks were being sold on Amazon through a storefront called "Z-MAll."  Because no identifying or contact information for the storefront's operators was provided on the "Z-MAll" storefront, Amway conducted an investigation to determine the identities of the individual(s) or entity(ies) that operate the storefront.

90.     Amway first served a subpoena on Amazon.com, Inc. ("Amazon.com") that sought all identifying information provided by the operator(s) of the "Z-MAll" storefront.  Third-party sellers on the Amazon online marketplace must provide identifying information to Amazon.com when they register to sell goods on the Amazon website.

91.     In response to the subpoena, Amazon.com produced various identifying information including a Google email address and the street address "4002 Bowne St., #178, Flushing, NY 11354."

92.     Through further investigation, Amway discovered that 4002 Bowne St., Flushing NY 11354 is the address of the business Secure Shipping, and that "#178" is a mailbox at Secure Shipping that is available for rental by customers.

93.     To further identify the operators of the "Z-MAll" storefront, Amway served a subpoena on Secure Shipping that asked it to produce all contact and identifying information provided by customer(s) who had rented mailbox 178 at Secure Shipping since January 1, 2018.

Businesses such as Secure Shipping that rent private mailboxes to customers are required by law to collect certain information from any customers who rent mailboxes.

94.     In response to the subpoena, Secure Shipping provided the name "Wei Quan Weng." Secure Shipping also provided a phone number, a New York driver's license number, and the address 143-30 Roosevelt Ave, Apt. 5L, Flushing, NY 11354 (the "Roosevelt Ave. Address").

95.     Through further investigation, Amway discovered that the phone number disclosed by Secure Shipping is a mobile phone number that, according to public-records databases, is used by Weiquan Weng.

96.     Through further investigation, Amway also discovered that the New York driver's license number disclosed by Secure Shipping is Weiquan Weng's driver's license number, according to public-records databases.

97.     Through further investigation, Amway also discovered that, according to databases, Weiquan Weng recently lived at the Roosevelt Ave. Address.

98.     To further confirm Weiquan Weng's operation of the "Z-MAll" storefront and the information disclosed by Secure Shipping, Amway served a subpoena on Google Inc. that sought information provided by the subscriber of the Google email address that had been produced by Amazon.com as contact information for the operator(s) of the "Z-MAll" storefront.

99.     In response to Amway's subpoena, Google Inc. disclosed the same mobile phone number that had been disclosed by Secure Shipping, which is used by Weiquan Weng.

100.     Through further investigation, Amway also discovered that there is a limited liability company organized under New York law called "Zmallstore LLC." Articles of organization of Zmallstore LLC were filed with the New York Department of State on June 24,

2020, and the only contact information for Zmallstore LLC that is provided in the articles of organization is a single address: "4002 BOWNE STREET 178, FLUSHING, NY 11354."

101. Based on all of these findings, including the similarity of the names "Z-MAll" and "Zmallstore," Plaintiffs believe that Weiquan Weng is in control of Zmallstore LLC and that Weng and Zmallstore LLC jointly operate the "Z-MAll" storefront and are responsible for the unlawful conduct complained of herein. Discovery may reveal that additional individuals and/or entities also assist in the operation of the "Z-MAll" Amazon storefront.

102. Weng used to be an Amway IBO. Weng signed an agreement to become an IBO on June 22, 2018, but Amway terminated his agreement on July 15, 2019 after discovering that Weng was selling Amway products to persons who Weng knew were reselling the products on the Internet, in violation of his IBO agreement. Weng has not been an IBO since July 15, 2019.

103. Zmallstore LLC is not and has never been an Amway IBO.

104. On or about September 11, 2020, Amway, through counsel, contacted counsel for Weng and alerted counsel that Weng had been connected to the "Z-MAll" storefront. Weng, though counsel, denied that he was involved in the current operation of the storefront but provided the address of Secure Shipping as the contact address of the true operator of the storefront. Amway then informed Weng that it had served subpoenas on Amazon.com, Secure Shipping, and Google Inc., and that all of the information provided by these entities—including Weng's name, phone number, driver's license number, and current or prior address—connected Weng to the "Z-MAll" storefront and to mailbox 178 at Secure Shipping.

105. On September 22, 2020, counsel for Weng wrote that he would "further consult" with Weng about the information Amway had provided and Amway's demand that the "Z-MAll" storefront cease selling products bearing the Amway Registered Trademarks. As of the time of

filing, however, Weng has not communicated any further with Amway and the "Z-MAll" storefront has continued to sell infringing products bearing the Amway Registered Trademarks, without any abatement.

106. Defendants have sold—and are continuing to sell—a high volume of infringing products bearing the Amway Trademarks through their "Z-MAll" storefront. Monitoring software shows that, since April 2020, Defendants have sold more than 3,400 infringing products through their storefront for revenue in excess of $200,000.

107. As of the time of filing, Defendants' Amazon storefront is called "Z-MAll." Amazon.com allows storefront operators to change the name of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed. The Merchant ID number for Defendants' storefront is A2LQOSOL8B8JEQ. Even if Defendants change the name of their Amazon storefront at some time in the future, their storefront can be accessed at the following link that includes the Merchant ID number for their storefront:

a. https://www.amazon.com/sp?seller=A2LQOSOL8B8JEQ.

108. Defendants' disregard of Plaintiffs' demands and their continued sale of non-genuine products despite being informed of their unlawful conduct demonstrate that Defendants are acting intentionally, willfully, and maliciously.

**Defendants Are Selling Damaged, Tampered With, and Improperly Sealed Products Through Their Amazon Storefront and Providing Poor Customer Service**

109. Customer reviews of Defendants' "Z-MAll" Amazon storefront show that Defendants have sold products that were damaged, not properly sealed, tampered with, or of otherwise poor quality. Customer reviews also show that Defendants are providing poor customer

service, including sending products that were different from what customers had ordered, not allowing customers to return products, and ignoring requests for help from customers.

110.   For example, on June 21, 2020, Amazon user "Wenxiu Feng" complained that Defendants sold her a product through their Amazon storefront that was "missing part[s] and came damaged."

⭐☆☆☆☆  *"Missing part and came damaged"*
By Wenxiu Feng on June 21, 2020.

111.   On March 26, 2020, Amazon user "Adriana" complained that Defendants "tampered with my product by breaking the seal and removing the barcode and then cover[ed] it up by placing the white sticker on top." She called Defendants' conduct "Disgraceful" and urged other customers: "DO NOT PURCHASE!!"


⭐☆☆☆☆  *"This seller tampered with my product by breaking the seal and removing the barcode and then covers it up by placing the white sticker on top. Disgraceful. DO NOT PURCHASE!!"*
Read less
By Adriana on March 26, 2020.

112.   On March 25, 2020, Amazon user "Mari-lynn" wrote to Defendants that "Your packaging is terrible. The box was put in a paper envelope and everything was crushed."

⭐☆☆☆☆  *"Your packaging is terrible. The box was put in a paper envelope and everything was crushed."*
By Mari-lynn on March 25, 2020.

113.   On February 8, 2020, another Amazon customer complained that two items he had purchased from Defendants "stopped working after 2 weeks" and he was then unable to return the items because Defendants did not provide a return mailing label. He wrote that he was "very disappointed."

⭐☆☆☆☆  *"both items stopped working after 2 weeks (ordered 2). tried to return it to Amazon. selected return within return window. but I selected wrong return method thinking I selected the print a label and drop it off. when I went in to print the label a couple days later there wasn't one. so I cancelled the return to redo it and then it said I can no longer return the item. very disappointed"*
Read less
By Amazon Customer on February 8, 2020.

114.     On March 9, 2020, Amazon user "griselda" complained that Defendants had sent her a different product from what she had ordered.  She asked Defendants if there is "something that you can do for me please," but Defendants did not respond to her request.

> ⭐☆☆☆☆ *"hI, i ordered size 5 and i did receive size 6 they are so big and I can't use them, is something that you can do for me please,..Thank"*
> By griselda on March 9, 2020.

115.     Additional other customers have complained of receiving products from Defendants that were damaged, improperly packaged, very old, or of otherwise poor quality. Customers have also complained that Defendants sent products that were different from what customers had ordered and did not provide for product returns, or never sent products at all.

116.     Defendants have not responded to any of the above complaints about their "Z-MAll" storefront.

117.     These complaints about Defendants are typical of the complaints made about the products sold and the customer service provided by unauthorized sellers on online marketplaces. A significant reason why Plaintiffs allow Amway products to be sold only by IBOs who are subject to Amway's quality controls and prohibit IBOs from selling products on online marketplaces is to prevent customers from suffering experiences like those described in the above complaints about Defendants.

**Defendants Are Infringing the Amway Registered Trademarks by Selling Products Bearing the Amway Registered Trademarks That Are Not Subject To, Do Not Abide By, and Interfere with Plaintiffs' Quality Control and Customer Service Requirements**

118.     Defendants, without authorization from Plaintiffs, have sold—and are currently selling—infringing products bearing the Amway Registered Trademarks through their "Z-MAll" Amazon storefront.  Defendants may also be selling infringing products through additional storefronts on Amazon or other channels that Plaintiffs have not yet discovered, and cannot discover until they are able to take discovery.

119.    Plaintiffs have implemented quality control and customer service requirements throughout their authorized channels of distribution.  The products sold by Defendants are not genuine Amway products because they are not subject to, and interfere with, Plaintiffs' quality control and customer service requirements that IBOs must follow.

120.    Plaintiffs' quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to these requirements, Plaintiffs have lost control of the quality of goods that bear their trademarks.  For example, Plaintiffs have no control over whether Defendants carry out the storage and handling requirements that IBOs are required to follow or whether Defendants sell products that are damaged, defective, repackaged, or otherwise altered.

121.    Defendants are also interfering with Plaintiffs' quality control and customer service requirements, among other ways, because Plaintiffs cannot track or conduct a recall of products that Defendants sell to consumers.  Defendants also do not advise—and are not capable of advising—customers about product information and best practices for safe and optimal use of Amway products because, as non-IBOs, they do not have access to the approved literature and other educational materials that IBOs are given to perform these services.

122.    The negative customer reviews of Defendants' "Z-MAll" storefront also show that Defendants are providing poor customer service and are selling products that are damaged, not properly sealed, tampered with, or of otherwise poor quality.  Given the high number of customers who have complained about the quality of products they purchased from Defendants, it is also likely that Defendants are responsible for some of the negative reviews of Amway products that appear elsewhere on the Amazon marketplace.  *See supra* ¶¶ 45–71.  For these reasons, the

products being sold by Defendants are also not genuine Amway products because they do not abide by Plaintiffs' quality control and customer service requirements that IBOs must follow.

123.    Through their unauthorized use of the Amway Registered Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Amway products. In reality, however, the products sold by Defendants are materially different from genuine Amway products because they are not subject to, do not abide by, and interfere with Plaintiffs' quality control and customer service requirements.

**Defendants Are Infringing the Amway Registered Trademarks by Selling Products Bearing the Amway Registered Trademarks That Do Not Come With the Amway Satisfaction Guarantee**

124.    As set forth above, Amway products purchased from Plaintiffs or IBOs come with the Amway Satisfaction Guarantee. Amway, however, does not provide the Satisfaction Guarantee for products purchased from any third party who is not an IBO because Amway cannot ensure the quality of products sold by sellers that are not subject to Plaintiffs' quality controls.

125.    Because Defendants are not IBOs and, thus, are not subject to Plaintiffs' quality control requirements, the products they sell bearing the Amway Registered Trademarks do not come with the Satisfaction Guarantee.

126.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Amway products.

127.    The Satisfaction Guarantee is a material element of genuine Amway products. Consumers considering whether to purchase Amway products would find it relevant to their purchasing decision to know whether the product they are purchasing is eligible for the Satisfaction Guarantee. Consumers who purchase Amway products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Amway stands behind the

product, and that they will have 180 days to get a refund, credit, or product replacement if they are dissatisfied with their product for any reason.

128.    Defendants' unauthorized sale of products bearing the Amway Registered Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Amway products that come with the Satisfaction Guarantee when, in fact, they are not.

### Defendants Are Tortiously Interfering With Amway's Contracts and Business Relationships With IBOs

129.    As discussed, Plaintiffs sell Amway products to U.S. consumers exclusively through Amway.com and through IBOs.

130.    Amway has entered into contracts with all of its IBOs that prohibit IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet.

131.    Defendants have sold and are continuing to sell an exceptionally high volume of products bearing the Amway Registered Trademarks on the Internet.  The only plausible way that Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more IBOs.  Thus, upon information and belief, Defendants have purchased products from IBOs for the purpose of reselling them on the Internet.

132.    Amway's contracts with its IBOs are a specific class of contract that Defendants are causing IBOs to breach when they purchase Amway products from IBOs.  Although Plaintiffs do not yet know which specific IBO(s) have breached their contracts with Amway—and indeed cannot learn that information with certainty until they are able to take discovery from Defendants in this action—Defendants know how they obtained the products they have sold and are on notice of the basis for Plaintiffs' claim of tortious interference.

133. By purchasing Amway products from IBOs and then reselling them on the Internet, Defendants caused and induced IBOs to breach their contracts with Amway.

134. Defendants have known that Amway's contracts with IBOs prohibit IBOs from selling Amway products to third parties, such as Defendants, who the IBOs know or have reason to know are going to resell the products on the Internet.

135. Defendants have known of this prohibition, among other reasons, because Weng used to be an IBO and agreed to follow the Amway Rules, including the requirement that IBOs may not sell Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet. Indeed, Amway terminated its IBO agreement with Weng in July 2019 for this exact reason, after it discovered that Weng was selling Amway products to persons who Weng knew were reselling the products on the Internet.

136. Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Amway's contracts with its IBOs by inducing IBOs to breach their contracts and sell Amway products to Defendants that Defendants then resold on the Internet.

137. In interfering with Amway's contracts, Defendants acted without justification and with a wrongful purpose. Defendants purchased Amway products from IBOs—and in so doing, instigated a breach of the IBOs' contracts with Amway—so that Defendants could unlawfully infringe upon and materially damage the value of the Amway Registered Trademarks by reselling the products on the Internet, thereby committing an independent tort.

138. Defendants are not parties to the contracts they caused IBOs to breach.

**Plaintiffs Have Suffered Substantial Harm As A Result of Defendants' Conduct**

139.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage to the value of their intellectual property, harm to the goodwill associated with the Amway family of brands, and damage to their existing and potential business relations.

140.    Defendants' conduct was and is knowing, intentional, willful, intentional, malicious, wanton, and contrary to law.

141.    Plaintiffs are entitled to injunctive relief because Defendants will otherwise continue to unlawfully sell products bearing the Amway Registered Trademarks that are materially different from genuine Amway products sold by IBOs and are outside of Plaintiffs' quality controls, thereby compromising such controls.  Defendants' ongoing unlawful conduct has caused and will continue to cause irreparable harm to Plaintiffs' reputation, goodwill, business relationships, intellectual property, and brand integrity.

## COUNT I
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)

142.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

143.    Plaintiffs are the owner and licensee of the Amway Registered Trademarks.

144.    Alticor has registered the Amway Registered Trademarks with the United States Patent and Trademark Office.

145.    The Amway Registered Trademarks are valid and subsisting trademarks in full force and effect.

146. Defendants have willfully and knowingly used, and continue to use, the Amway Registered Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

147. The products that Defendants sell bearing the Amway Registered Trademarks are not authorized for sale by Plaintiffs.

148. Defendants' use of the Amway Registered Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Registered Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

149. Defendants' use of the Amway Registered Trademarks in connection with their sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

150. The products sold by Defendants are not, in fact, genuine and authentic Amway products. The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Amway's quality control requirements that IBOs must follow.

151. Defendants' unauthorized use of the Amway Registered Trademarks has materially damaged the value of the Amway Registered Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Registered Trademarks.

152. As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

153. Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Amway Registered Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

154. Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

155. Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Amway Registered Trademarks.

## COUNT II
### Unfair Competition
### 15 U.S.C. § 1125(a)(1)(A)

156. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

157. Defendants have willfully and knowingly used, and continue to use, the Amway Registered Trademarks in commerce for the purpose of selling Amway products on the Internet without Plaintiffs' consent.

158. The products that Defendants sell bearing the Amway Registered Trademarks are not authorized for sale by Plaintiffs.

159. Defendants' use of the Amway Registered Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Registered Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs when they are not.

160. Defendants' use of the Amway Registered Trademarks in connection with their sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products when they are not.

161. Defendants' unauthorized sale of products bearing the Amway Registered Trademarks and unauthorized use of the Amway Registered Trademarks in advertising infringes on the Amway Registered Trademarks.

162. Defendants' unauthorized sale of products bearing the Amway Registered Trademarks and unauthorized use of the Amway Registered Trademarks in advertising has materially damaged the value of the Amway Registered Trademarks and has caused significant damages to Plaintiffs' business relations.

163. As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

164. Plaintiffs are entitled to recover their damages caused by Defendants' unfair competition and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

165. Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

166. Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Amway Registered Trademarks.

**COUNT III**
**Trademark Dilution**
**15 U.S.C. § 1125(c)**

167.    Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

168.    Products bearing the AMWAY® trademark have been sold to the public since 1959.  For 60 years, Plaintiffs and their predecessor companies have been recognized by consumers as the source of high quality products bearing the AMWAY® trademark, beginning with cleaning products and expanding to nutrition, beauty, bath and body, cookware, household, and many other types of products.

169.    The AMWAY® trademark was first filed with the United States Patent and Trademark Office in 1960, and was registered in 1961.  Since that time, the AMWAY® trademark has been filed and registered with respect to numerous categories of goods and services.

170.    Alticor owns the Amway Registered Trademarks and has licensed the Amway Registered Trademarks to various subsidiaries, including Amway.

171.    Plaintiffs have expended substantial time, effort, money, and resources advertising and promoting products and services under the AMWAY® trademark.  As a result of Plaintiffs' efforts, the AMWAY® trademark is the means by which Amway products and services are distinguished from others in the marketplace.

172.    Plaintiffs market, advertise, and sell products bearing the AMWAY® trademark throughout the United States.

173. Amway has implemented legitimate and substantial quality controls that it requires all IBOs to follow to protect the Amway name and family of brands.

174. Consumers throughout the United States recognize and associate the Amway name with quality.

175. Because of the quality, durability, and dependability of Amway products and Plaintiffs' use of the AMWAY® trademark, consumers trust the Amway name and Amway products.

176. The AMWAY® trademark is inherently distinctive, and as a result of Plaintiffs' long and continuous use of the AMWAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Plaintiffs' products and services.

177. Amway is widely recognized as the designated source of goods bearing the AMWAY® trademark.

178. For these reasons, since at least 1970, the AMWAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

179. After the AMWAY® trademark became famous, beginning on or around April 2020, Defendants have willfully used the AMWAY® trademark in connection with the unauthorized and unlawful sale of products.

180. Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by Plaintiffs' quality controls, consumers who purchase products from Defendants are more likely to receive a poor quality, damaged, or defective product and have an unsatisfactory customer experience.

181. Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by IBOs are likely to associate that negative

experience with Plaintiffs and the AMWAY® trademark. As a result Defendants' unauthorized and willful use of the AMWAY® trademark is tarnishing and diluting the value and distinctive quality of the AMWAY® trademark.

182. Defendants' unlawful actions have harmed the reputation and goodwill associated with the AMWAY® trademark, and Plaintiffs have suffered and will continue to suffer immediate and irreparable injury. Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Amway products.

183. As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

184. Plaintiffs are entitled to recover their damages caused by Defendants' dilution of the AMWAY® Trademark and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

185. Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

186. Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Amway Registered Trademarks.

## COUNT IV
### Common Law Trademark Infringement and Unfair Competition

187. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

188. This claim arises under the laws of the State of New York.

189.    Defendants have willfully and knowingly used, and continue to use, the Amway Registered Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

190.    The products that Defendants sell bearing the Amway Registered Trademarks are not authorized for sale by Plaintiffs.

191.    Defendants' use of the Amway Registered Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Amway Registered Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

192.    Defendants' use of the Amway Registered Trademarks in connection with their sale of Amway products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Amway products.

193.    The products sold by Defendants are not, in fact, genuine and authentic Amway products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Amway's quality control requirements that IBOs must follow.

194.    Defendants' unauthorized use of the Amway Registered Trademarks has materially damaged the value of the Amway Registered Trademarks, caused significant damage to Plaintiffs' business relations, and infringed on the Amway Registered Trademarks.

195.    As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

196.     Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Amway Registered Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

197.     Plaintiffs are also entitled to punitive damages because Defendants have acted with such a conscious and deliberate disregard of the interests of others that their conduct may be called willful or wanton.

## COUNT V
### Unfair and Deceptive Business Practices
### NY Gen. Bus. Law § 349

198.     Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

199.     Defendants have engaged and are engaging in consumer-oriented conduct which is deceptive or misleading in a material way, constituting unfair and deceptive business practices in violation of Section 349 of the New York General Business Law.

200.     Defendants' knowing and willful use of the Amway Registered Trademarks in connection with the unauthorized and illegal sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Plaintiffs when they are not.

201.     Defendants' knowing and willful use of the Amway Registered Trademarks in connection with the unauthorized and illegal sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine and authentic Amway products when, in fact, they are not.

202.     Defendants' conduct is likely to mislead a sensible consumer acting reasonably under the circumstances.

203. Defendants' conduct has resulted or is likely to result in consumer injury or harm to the public interest.

204. Defendants' unfair and deceptive business practices have caused Plaintiffs to suffer, and continue to suffer, substantial injury, including loss of sales and damage to their existing and potential business relations.

205. Plaintiffs are also entitled to punitive damages because Defendants have acted with such a conscious and deliberate disregard of the interests of others that their conduct may be called willful or wanton.

## COUNT VI
### Tortious Interference with Existing and/or Prospective Contracts and Business Relationships

206. Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

207. This claim arises under the laws of the State of New York.

208. Plaintiffs sell Amway products to U.S. consumers exclusively through Amway.com and through IBOs.

209. Amway has entered into contracts with IBOs that prohibit IBOs from selling Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet.

210. Defendants have sold and are continuing to sell an exceptionally high volume of products bearing the Amway Registered Trademarks on the Internet. The only plausible way that Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more IBOs. Thus, upon information and belief, Defendants have purchased products from IBOs for the purpose of reselling them on the Internet.

211. By purchasing Amway products from IBOs and then reselling them on the Internet, Defendants caused and induced IBOs to breach their contracts with Amway.

212. Defendants have known that Amway's contracts with IBOs prohibit IBOs from selling Amway products to third parties, such as Defendants, who the IBOs know or have reason to know are going to resell the products on the Internet.

213. Defendants have known of this prohibition, among other reasons, because Weng used to be an IBO and agreed to follow the Amway Rules, including the requirement that IBOs may not sell Amway products to persons or entities that IBOs know, or have reason to know, are going to resell the products on the Internet. Indeed, Amway terminated its IBO agreement with Weng in July 2019 for this exact reason, after it discovered that Weng was selling Amway products to persons who Weng knew were reselling the products on the Internet.

214. Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Amway's contracts with its IBOs by inducing IBOs to breach their contracts and sell Amway products to Defendants that Defendants resold on the Internet.

215. In interfering with Amway's contracts, Defendants acted without justification and with a wrongful purpose. Defendants purchased Amway products from IBOs—and in so doing, instigated a breach of the IBOs' contracts with Amway—so that Defendants could unlawfully infringe upon and materially damage the value of the Amway Registered Trademarks by reselling the products on the Internet, thereby committing an independent tort.

216. Defendants are not parties to the contracts they caused IBOs to breach.

217. Defendants' actions have caused Plaintiffs to suffer, and continue to suffer, substantial injury, including loss of sales and damage to their existing and potential business relations.

218. Plaintiffs are also entitled to punitive damages because Defendants have acted with such a conscious and deliberate disregard of the interests of others that their conduct may be called willful or wanton.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Judgment in favor of Plaintiffs and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest, as permitted by law;

B. A permanent injunction enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

    i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Amway products,

    ii)    Prohibiting the Enjoined Parties from using any of the Amway Registered Trademarks in any manner, including advertising on the Internet,

    iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Amway products as well as any products bearing any of the Amway Registered Trademarks,

    iv)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Amway Registered Trademarks

including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks,

v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any Amway products or any of the Amway Registered Trademarks,

vi)      Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Amway Registered Trademarks which associate Amway products or the Amway Registered Trademarks with the Enjoined Parties or the Enjoined Parties' websites,

vii)      Requiring the Enjoined Parties to take all action to remove the Amway Registered Trademarks from the Internet, including from the website www.amazon.com;

C.      An award of attorneys' fees, costs, and expenses; and

D.      Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.


Dated: October 20, 2020                 Respectfully submitted

                                    *Ryan Weiner*

                                    Anna Aguilar
                                    Ryan Weiner
                                    AGUILAR BENTLEY LLC
                                    5 Penn Plaza, 19th Floor
                                    New York, NY 10001
                                    Telephone: (212) 835-1521
                                    Facsimile: (646) 924-0599
                                    aaguilar@aguilarbentley.com
                                    rweiner@aguilarbentley.com

                                    *Attorneys for Plaintiffs Alticor Inc. and Amway Corp.*